## UNITED STATES v. GEORGE A. FULLER CO., Inc.

(Circuit Court of Appeals, Eighth Circuit. September 13, 1926.)

**1. Pleading ⬳48.**

Under Code pleading, dealing with substance and not formalities, facts stated in petition determine its character and sufficiency.

**2. United States ⬳75—Petition by government against cantonment construction contractor held to state no cause of action in tort, allegations of destruction and waste of material being made as instances of alleged breach of attached contract.**

Petition of United States against contractor for construction of cantonment held to state no cause of action in tort, all allegations about destruction or waste of material, which under

contract became property of plaintiff, being made, not as independent causes of action, but as instances of alleged neglect of duty under contract, made part of pleading, and alleged to have been breached.

**3. Pleading ⬳48.**

General demurrer is well taken, when petition shows no legal wrong has been done, or omits averment necessary to establish wrong to plaintiff.

**4. Pleading ⬳34(5).**

Allegation that one failed to make provision against happening of event does not involve averment that it happened because of such failure, or even that it happened.

**5. Pleading ⬳8(7).**

Petition of United States for breach of cost plus contract for construction of cantonment, by allegations of failure to exercise due care and skill in organizing, planning, and superintending work without statement of standard, *held* to state mere conclusions.

**6. Contracts ⬳337(1).**

Petition for breach of contract by negligence or fraud must state the facts constituting the same, and reasonably show that they were in violation of contract and injured plaintiff.

**7. United States ⬳75—Petition of government for negligence in performance of cost plus contract held by necessary implication to show contractor was paid on monthly statements as provided by contract.**

Petition of United States for negligence of contractor in performance of cost plus contract for construction of cantonment, causing excessive cost, *held* by necessary implication to show that defendant was paid, as required by contract, on monthly settlements with contracting officer, there being no presumption that they were not so made, as it would rest on an assumption of criminal conduct on the part of government officials.

**8. Contracts ⬳284(4)—Settlement by arbitrator of amount due in performance of contract, by it provided for and declared final and binding, unless avoided for his fraud, prevents action for breach of contract.**

When parties to contract therein agree on umpire or arbitrator and empower him to make settlement of amount due in performance of contract, and provide it shall be final and binding on both, neither can sue the other for acts based on the contract relation without avoiding the settlement for arbitrator's fraud, gross mistake, or failure to exercise honest judgment.

**9. Appeal and error ⬳1073(1)—That court, even if without power, orders costs to be taxed to plaintiff, the United States, held not ground for reversal of judgment of dismissal.**

It is not ground for reversing judgment dismissing action by United States that it orders costs taxed to plaintiff, as, if court was without power to tax plaintiff therewith, its order in that respect is void, and not prejudicial.

In Error to the District Court of the United States for the District of Kansas; John C. Pollock, Judge.

Action by the United States against the George A. Fuller Company, Incorporated. Demurrer to petition was sustained, and cause dismissed (6 F.[2d] 879), and plaintiff brings error. Affirmed.

See, also, 296 F. 178; 300 F. 206.

### Statement of the Case.

The contract for consideration in this case contains fifteen articles and reads thus:

"Exhibit A.

"Contract for Emergency Work.

"Construction of Cantonment at Fort Riley, Kansas.

"Contract made and concluded this Twentieth day of June, 1917, by and between George A. Fuller Construction Co., of Kansas City, County of ——, State of Missouri, a corporation organized under the laws of the State of Missouri, represented by Paul Starrett, its President, party of the first part (hereinafter called Contractor), and the United States of America by Major W. A. Dempsey, Q. M. U. S. R. (hereinafter called Contracting Officer), acting by authority of the Secretary of War, party of the second part.

"Whereas, the Congress having declared by Joint Resolution approved April 6, 1917, that war exists between the United States of America and Germany, a national emergency exists and the United States urgently requires the immediate performance of the work hereinafter described, and it is necessary that said work shall be completed within the shortest possible time; and

"Whereas, it is advisable under the disturbed conditions which exist in the contracting industry throughout the country for the United States to depart from the usual procedure in the matter of letting contracts, and adopt means that will insure the most expeditous results; and

"Whereas, the Contractor has had experience in the execution of similar work, has an organization suitable for the performance of such work, and is ready to undertake the same upon the terms and conditions herein provided:

"Now, Therefore, This Contract Witnesseth, That in consideration of the premises and of the payments to be made as hereinafter provided, the Contractor hereby covenants and agrees to and with the Contracting Officer as follows:

"Camp Funston, Kan.

### "Article I.

"Extent of the Work. The Contractor shall, in the shortest possible time, furnish the labor, material, tools, machinery, equipment, facilities, and supplies, and do all things necessary for the construction and completion of the following work:

"At Fort Riley, Kansas.

"Buildings and other utilities except roads, stoves, bunks, mattresses, ranges and refrigerators for a Division of Infantry including the following additional units, viz.:

"1 Telegraph Battalion.

"1 Regiment Heavy Artillery, horse drawn.

"1 Additional Brigade Headquarters.

"3 Regiments Infantry.

"Camp Funston in accordance with the drawings and specifications to be furnished by the Contracting Officer, and subject in every detail to his supervision, direction and instruction.

"The Contracting Officer may, from time to time, by written instructions or drawings issued to the Contractor, make changes in said drawings and specifications, issue additional instructions, require additional work, or direct the omission of work previously ordered, and the provisions of this contract shall apply to all such changes, modifications, and additions with the same effect as if they were embodied in the original drawings and specifications. The Contractor shall comply with all such written instructions or drawings:

"The title to all work completed or in course of construction shall be in the United States; and upon delivery at the site of the work, and upon inspection and acceptance in writing by the Contracting Officer, all machinery, equipment, hand tools, supplies, and materials, for which the Contractor shall be entitled to be reimbursed under paragraph (a) of Article II hereof, shall become the property of the United States. These provisions as to title shall not operate to relieve the Contractor from any duties imposed hereby or by the Contracting Officer.

### "Article II.

"Cost of the Work. The Contractor shall be reimbursed in the manner hereinafter described for such of its actual net expenditures in the performance of said work as may be approved or ratified by the Contracting Officer and as are included in the following items:

"(a) All labor, material, machinery, hand tools not owned by the workmen, supplies and equipment, necessary for either temporary or permanent use for the benefit of said work; but this shall not be construed

to cover machinery or equipment mentioned in section (c) of this Article. The Contractor shall make no departure from the standard rate of wages being paid in the locality where said work is being done, without the prior consent and approval of the Contracting Officer.

"(b) All sub-contracts made in accordance with the provisions of this agreement.

"(c) Rental actually paid by the Contractor, at rates not to exceed those mentioned in the schedule of rental rates hereto attached, for construction plant in sound and workable condition, such as pumps, derricks, concrete mixers, boilers, clam-shell or other buckets, electric motors, electric drills, electric hammers, electric hoists, steam shovels, locomotive cranes, power saws, engineers' levels and transits, and such other equipment as may be necessary for the proper and economical prosecution of the work.

"Rental to the Contractor for such construction plant or parts thereof as it may own and furnish, at the rates mentioned in the schedule of rental rates hereto attached, except as hereinafter set forth. When such construction plant or any part thereof shall arrive at the site of the work, the Contractor shall file with the Contracting Officer a schedule setting forth the fair valuation at that time of each part of such construction plant. Such valuation shall be deemed final, unless the Contracting Officer shall, within five days after the machinery has been set up and is working, modify or change such valuation, in which event the valuation so made by the Contracting Officer shall be deemed final. When and if the total rental paid to the Contractor for any such part shall equal the valuation thereof, no further rental therefor shall be paid to the Contractor and title thereto shall vest in the United States. At the completion of the work, the Constructing (Contracting) Officer may at his option purchase for the United States any part of such construction plant then owned by the Contractor by paying to the Contractor the difference between the valuation of such part or parts and the total rentals theretofore paid therefor.

"Rates of rental as substitutes for such scheduled rental rates may be agreed upon in writing between the Contractor and the Contracting Officer, such rates to be in conformity with rates of rental charged in the particular territory in which the work covered by this contract is to be performed. If the Contracting Officer shall furnish or supply any such equipment, the Contractor shall not be allowed any rental therefor and shall receive no fee for the use of such equipment.

"(d) Loading and unloading such construction plant, the transportation thereof to and from the place or places where it is to be used in connection with said work subject to the provisions hereinafter set forth, the installation and dismantling thereof, and ordinary repairs and replacements during its use in the said work.

"(e) Transportation and expenses to and from the work of the necessary field forces for the economical and successful prosecution of the work, procuring labor and expediting the production and transportation of material and equipment.

"(f) Salaries of resident engineers, superintendents, time-keepers, foremen, and other employees at the field offices of the Contractor in connection with said work. In case the full time of any field employee of the Contractor is not applied to said work but is divided between said work and other work, his salary shall be included in this item only in proportion to the actual time applied to this work.

"(g) Buildings and equipment required for necessary field offices, commissary and hospital, and the cost of maintaining and operating said offices, commissary and hospital, including such minor expenses as telegrams, telephone service, expressage, postage, etc.

"(h) Such bonds, fire, liability, and other insurance as the Contracting Officer may approve or require; and such losses and expenses, not compensated by insurance or otherwise, as are found and certified by the Contracting Officer to have been actually sustained (including settlements made with the written consent and approval of the Contracting Officer) by the Contractor in connection with said work, and to have clearly resulted from causes other than the fault or neglect of the Contractor. Such losses and expenses shall not be included in the cost of the work for the purpose of determining the Contractor's fee. The cost of reconstructing and replacing any of the work destroyed or damaged shall be included in the cost of the work for the purpose of reimbursement to the Contractor, but not for the purpose of determining the Contractor's fee, except as hereinafter provided.

"(i) Permit fees, deposits, royalties, and other similar items of expense incidental to the execution of this contract, and necessarily incurred. Expenditures under this item must be approved in advance by the Contracting Officer.

"(j) Such proportion of the transporta-

tation, traveling and hotel expenses of officers, engineers, and other employees of the Contractor as is actually incurred in connection with this work.

"(k) Such other items as should in the opinion of the Contracting Officer be included in the cost of the work. When such an item is allowed by the Contracting Officer, it shall be specifically certified as being allowed under this paragraph.

"The United States reserves the right to pay directly to common carriers any or all freight charges on material of all kinds, and machinery, furnished under this contract, and certified by the Contracting Officer as being for installation or for consumption in the course of the work hereunder; the Contractor shall be reimbursed for such freight charges of this character as it shall pay and as shall be specifically certified by the Contracting Officer; but the Contractor shall have no fee based on such expenditures. Freight charges paid by the Contractor for transportation of construction equipment, construction plant, tools and supplies of every character, shall be treated as part of the cost of the work upon which the Contractor's fee shall be based; provided that charges for transportation of such construction equipment, construction plant and tools over distances in excess of five hundred miles shall require the special approval of the Contracting Officer.

"No salaries of the Contractor's Executive Officers, no part of the expense incurred in conducting the Contractor's main office, or regularly established branch office, and no overhead expenses of any kind, except as specifically listed above, shall be included in the cost of the work; nor shall any interest on capital employed or on borrowed money be included in the cost of the work.

"The Contractor shall take advantage to the extent of its ability of all discounts available, and when unable to take such advantage shall promptly notify the Contracting Officer of its inability and its reasons therefor.

"All revenue from the operations of the commissary, hospital or other facilities or from rebates, refunds, etc. shall be accounted for by the Contractor and applied in reduction of the cost of the work.

## "Article III.

"Determination of Fee. As full compensation for the services of the Contractor, including profit and all general overhead expense, except as herein specifically provided, the Contracting Officer shall pay to the Contractor in the manner hereinafter prescribed a fee to be determined at the time of completion of the work from the following schedule, except as hereinafter otherwise provided:

"If the cost of the work is under $100,000.00 a fee of ten per cent (10%) of such cost.

"If the cost of the work is over $100,000.00 and under $125,000.00 a fee of $10,000.00.

"If the cost of the work is over $125,000.00 and under $250,000.00 a fee of eight per cent (8%) of such cost.

"If the cost of the work is over $250,000.00 and under $266,666.67 a fee of $20,000.00.

"If the cost of the work is over $226,666.67 and under $500,000.00 a fee of seven and one-half per cent (7½%) of such cost.

"If the cost of the work is over $500,000.00 and under $535,714.29 a fee of $37,500.00.

"If the cost of the work is over $535,714.29 and under $3,000,000.00 a fee of seven per cent (7%) of such cost.

"If the cost of the work is over $3,000,000.00 and under $3,500,000.00 a fee of $210,000.00.

"If the cost of the work is over $3,500,000.00 a fee of six per cent (6%) of such cost:

"Provided, however, that the fee upon such part of the cost of the work as is represented by payments to sub-contractors, under subdivision (b) above, shall in each of the above contingencies be five per cent (5%) and no more of the amount of such part of the cost.

"The cost of materials purchased or furnished by the Contracting Officer for said work, exclusive of all freight charges thereon, shall be included in the cost of the work for the purpose of reckoning such fee to the Contractor, but for no other purpose.

"The fee for reconstructing and replacing any of the work destroyed or damaged shall be such percentage of the cost thereof,—not exceeding seven per cent (7%),—as the Contracting Officer may determine.

"The total fee to the Contractor hereunder shall in no event exceed the sum of $250,000.00, anything in this agreement to the contrary notwithstanding.

## "Article IV.

"Payments. On or about the seventh day of each month the Contracting Officer and the Contractor shall prepare a statement showing as completely as possible: (1) the cost of the work up to and including the last

day of the previous month, (2) the cost of the materials furnished by the Contracting Officer up to and including such last day, and (3) an amount equal to three and one-half per cent (3½%), except as herein otherwise provided, of the sum of (1) and (2) on account of the Contractor's fee; and the Contractor at such time shall deliver to the Contracting Officer original signed pay-rolls for labor, original invoices for materials purchased and all other original papers not theretofore delivered supporting expenditures claimed by the Contractor to be included in the cost of the work. If there be any item or items entering into such statement upon which the Contractor and the Contracting Officer cannot agree, the decision of the Contracting Officer as to such disputed item or items shall govern. The Contracting Officer shall then pay to the Contractor on or about the ninth day of each month the cost of the work mentioned in (1) and the fee mentioned in (3) of such statement, less all previous payments. When the statement above mentioned includes any work of reconstructing and replacing work destroyed or damaged, the payment on account of the fee in (3) for such reconstruction and replacement work shall be computed at such rate, not exceeding three and one-half per cent (3½%), as the Contracting Officer may determine. The statement so made and all payments made thereon shall be final and binding upon both parties hereto, except as provided in Article XIV hereof. The Contracting Officer may also make payments at more frequent intervals for the purpose of enabling the Contractor to take advantage of discounts at intervals between the dates above mentioned or for other lawful purposes. Upon final completion of said work the Contracting Officer shall pay to the Contractor the unpaid balance of the cost of the work and of the fee as determined under Articles II and III hereof.

## "Article V.

"Inspection and Audit. The Contracting Officer shall at all times be afforded proper facilities for inspection of the work and shall at all times have access to the premises, to the work and material, and to all books, records, correspondence, instructions, plans, drawings, receipts, vouchers, and memoranda of every description of the Contractor pertaining to said work; and the Contractor shall preserve for a period of two years after its completion or cessation of work under this contract, all the books, records, and other papers just mentioned. Any duly authorized representative of the Contractor shall be accorded the privilege of examining the books, records, and papers of the Contracting Officer relating to said work for the purpose of checking up and verifying the cost of said work. The system of accounting to be employed by the Contractor shall be such as is satisfactory to the Contracting Officer.

"If at any time the Contracting Officer shall find that bills for labor or material, or other bills legitimately incurred by the Contractor hereunder, are not promptly paid by the Contractor, the Contracting Officer may, in his discretion, refuse to make further payments to the Contractor until all such obligations past due shall have been paid. Should the Contractor neglect or refuse to pay such bills within five days after notice from the Contracting Officer so to do, then the Contracting Officer shall have the right to pay such bills directly, in which event such direct payments shall not be included in the cost of the work.

## "Article VI.

"Special Requirements. The Contractor hereby agrees that it will:

"(a) Begin the work herein specified at the earliest time, practicable, and diligently proceed so that such work may be completed at the earliest possible date.

"(b) Promptly pay for all labor, material or other service rendered.

"(c) Procure, and thereafter maintain such insurance, in such forms and in such amounts, and for such periods of time as the Contracting Officer may approve or require.

"(d) Procure all necessary permits and licenses, and obey and abide by all laws, regulations, ordinances, and other rules applying to such work, of the United States of America, of the State or Territory wherein such work is done, or any subdivision thereof, or of any duly constituted public authority.

"(e) Unless this provision is waived by the Contracting Officer, insert in every contract made by it for the furnishing to it of services, materials, supplies, machinery and equipment, or the use thereof, for the purposes of the work hereunder, a provision that such contract is assignable to the United States; will make all such contracts in its own name, and will not bind or purport to bind the United States or the Contracting Officer thereunder.

"(f) In every sub-contract made in accordance with the provisions hereof, require the sub-contractor to agree to comply fully with all the undertakings and obligations of

the Contractor herein, excepting such as do not apply to such sub-contractor's work.

"(g) At all times keep at the site of the work a duly appointed representative who shall receive and execute on the part of the Contractor such notices, directions and instructions as the Contracting Officer may desire to give.

"(h) At all times use its best efforts in all its acts hereunder to protect and subserve the interest of the Contracting Officer and the United States.

## "Article VII.

"Right to Terminate Contract. Should the Contractor at any time refuse, neglect, or fail in any respect to prosecute the work with promptness and diligence or default in the performance of any of the agreements herein contained, the Contracting · Officer may, at his option, after five days written notice to the Contractor, terminate this contract, and may enter upon the premises and take possession, for the purpose of completing said work, of all materials, tools, equipment, and appliances, and all options, privileges and rights, and may complete, or employ any other person or persons to complete said work. In case of such termination of the contract, the Contracting Officer shall pay to the Contractor such amounts of money on account of the unpaid balance of the cost of the work and of the fee as will result in fully reimbursing the Contractor for the cost of the work up to the time of such termination, plus a fee computed thereon at the rate or rates for monthly payments set forth in Article IV hereof; and the Contracting Officer shall also pay to the Contractor compensation, either by purchase or rental at the election of the Contracting Officer, for any equipment retained; such compensation, in the event of rental, to be in accordance with paragraph (c) of Article II, and in the event of purchase to be based upon the valuation determined by the Contracting Officer as of the time of his taking such possession. The Contractor hereby · agrees that such payments when made shall constitute full settlement of all claims of the Contractor against the Contracting Officer and the United States or either of them for money claimed to be due to the Contractor for any reason whatsoever. In case of such termination of the contract the Contracting Officer shall further assume and become liable for all such obligations, commitments, and unliquidated claims as the Contractor may have theretofore in good faith undertaken or incurred in connection with said work, and the Contractor shall, as a condition of receiving the payments mentioned in this Article, execute and deliver all such papers, and take all such steps as the Contracting Officer may require for the purpose of fully vesting in him the rights and benefits of the Contractor under such obligations or commitments. When the Contracting Officer shall have performed the duties incumbent upon him under the provisions of this Article, the Contracting Officer shall thereafter be entirely released and discharged of and from any and all demands, actions, or claims of any kind, on the part of the Contractor hereunder or on account hereof.

## "Article VIII.

"Abandonment of Work by Contracting Officer. If conditions should arise which in the opinion of the Contracting Officer make it advisable or necessary to cease work under this contract, the Contracting Officer may abandon the work and terminate this contract. In such case the Contracting Officer shall assume and become liable for all such obligations, commitments and unliquidated claims as the Contractor may have theretofore, in good faith, undertaken or incurred in connection with said work; and the Contractor shall, as a condition of receiving the payments mentioned in this Article, execute and deliver all such papers, and take all such steps as the Contracting Officer may require for the purpose of fully vesting in him the rights and benefits of the Contractor under such obligations or commitments. The Contracting Officer shall pay to the Contractor such an amount of money on account of the unpaid balance of the cost of the work and of the fee, as will result in the Contractor receiving full reimbursement for the cost of the work up to the time of such abandonment, plus a fee to be computed in the following manner: To the cost of the work up to the time of such abandonment shall be added the amount of the contractual obligations or commitments assumed by the Contracting Officer, and such total shall be treated as the cost of the work, upon which the fees shall be computed in accordance with the provisions of Article III hereof. When the Contracting Officer shall have performed the duties incumbent upon him under the provisions of this Article, the Contracting Officer and the United States shall thereafter be entirely released and discharged of and from any and all demands, actions or claims of any kind on the part of the Contractor hereunder or on account hereof.

## "Article IX.

"Bond. The Contractor shall prior to commencing the said work furnish a bond, with sureties satisfactory to the Contracting Officer, in the sum of Two Hundred Fifty Thousand ($250,000.00) Dollars, conditioned upon its full and faithful performance of all the terms, conditions and provisions of this contract, and upon its prompt payment of all bills for labor, material, or other service furnished to the Contractor.

## "Article X.

"Convict Labor. No person or persons shall be employed in the performance of this contract who are undergoing sentence of imprisonment at hard labor imposed by the courts of any of the several states, territories, or municipalities having criminal jurisdiction.

## "Article XI.

"Hours and Conditions of Labor. No laborer or mechanic doing any part of the work contemplated by this contract, in the employ of the Contractor, or any sub-contractor contracting for any part of said work contemplated, shall be required or permitted to work more than eight (8) hours in any one calendar day upon such work, such prohibition being in accordance with the Act approved June 19, 1912, limiting the hours of daily service of mechanics and laborers on work under contracts to which the United States is a party. For each violation of the requirements of this Article a penalty of Five Dollars ($5.00) shall be imposed upon the Contractor for each laborer or mechanic for every calendar day in which said employee is required or permitted to labor more than eight (8) hours upon said work, and all penalties thus imposed shall be withheld for the use and benefit of the United States; Provided that this paragraph shall not be enforced nor shall any penalty be exacted in case such violation shall occur while there is in effect any valid Executive order suspending the provisions of said Act approved June 19, 1912, or waiving the provisions and stipulations thereof with respect to either this contract or any class of contracts in which this contract shall be included, or when the violation shall be due to any extraordinary events or conditions of manufacture, or to any emergency caused by fire, famine, or flood, by danger to life or property, or by other extraordinary events or conditions on account of which, by subsequent Executive order, such past violations shall have been excused.

"In the event of any dispute with reference to wages, hours, or other conditions appertaining to said work, between the Contractor or any sub-contractor and laborer employed by him on said work, the Contractor or sub-contractor shall immediately notify the Contracting Officer of the existence of such dispute and the reasons therefor. The Contracting Officer may, at his option, instruct the Contractor or sub-contractor involved in such dispute as to the method or steps which the Contractor or sub-contractor should follow with reference thereto, and the Contractor or sub-contractor shall thereupon comply with such instructions.

## "Article XII.

"Right to Transfer or Sublet. Neither this contract, nor any interest therein, shall be assigned or transferred. The contractor shall not enter into any sub-contract for any part of the work herein specified without the consent and approval in writing of the Contracting Officer. In case of such assignment, transfer, or sub-letting without the consent and approval, in writing, of the Contracting Officer, the Contracting Officer may refuse to carry out this contract either with the transferror or transferee, but all rights of action for any breach of this contract by the contractor are reserved to the United States.

## "Article XIII.

"No Participation in Profits by Government Officials. No member of, or delegate to, Congress, or Resident Commissioners, nor any other person belonging to or employed in the military service of the United States, is or shall be admitted to any share or part of this contract, or to any benefit that may arise therefrom, but this Article shall not apply to this contract so far as it may be within the operation or exception of section 116 of the Act of Congress approved March 4, 1909 (35 Stat. 1109).

## "Article XIV.

"Settlement of Disputes. This contract shall be interpreted as a whole and the intent of the whole instrument, rather than the interpretation of any special clause, shall govern. If any doubts or dispute shall arise as to the meaning or interpretation of anything in this contract, or if the Contractor shall consider himself prejudiced by any decision of the Contracting Officer made under the provisions of Article IV hereof, the matter shall be referred to the Officer in charge of Cantonment Construction for determination. If, however, the Contractor

shall feel aggrieved by the decision of the Officer in charge of Cantonment Construction, he shall have the right to submit the same to the Secretary of War, whose decision shall be final and binding upon both parties hereto.

### "Article XV.

"This contract shall bind and inure to the Contractor and its successors.

"It is understood and agreed that wherever the words 'Contracting Officer' are used herein, the same shall be construed to include his successor in office, any other person to whom the duties of the Contracting Officer may be assigned by the Secretary of War and any duly appointed representative of the Contracting Officer."

Attached to the contract was a schedule of per diem rental rates for machinery and appliances iin carrying on the work, which the Contractor could not exceed.

Plaintiff's third amended petition, to which a demurrer was filed and sustained, is as follows:

### "Third Amended Petition.

"The United States of America, plaintiff, by Al. F. Williams, United States Attorney for the District of Kansas, reserving its exceptions to the rulings and orders of the Court with respect to and on its prior petitions, by leave of Court, files this, its third amended petition, against the defendant, George A. Fuller Company, Inc., and alleges:

### "Count I.

"1. That during all of the times and at the dates herein mentioned the defendant, George A. Fuller Company, Inc., was, and now is, a corporation duly organized and existing and doing business under and by virtue of the laws of the State of New Jersey, with its principal place of business in the City of New York, State of New York.

"That the contract hereinafter referred to was to be performed and the causes of action herein set out arose in the Counties of Riley and Geary, in the District of Kansas, in connection with the construction by the defendant for the plaintiff of one of its National Army Cantonments, known as Camp Funston, situated near Fort Riley, in said Counties of Riley and Geary, and that the plaintiff and the defendant are the real parties in interest.

"2. That by joint resolution of Congress, approved by the President on the 6th day of April, 1917 (40 Stat. 1), a state of war was declared to exist between the United States of America and the Imperial German Government; that said state of war and active hostilities continued until hostilities were terminated on the 11th day of November, 1918, by an armistice signed between the plaintiff and its associated powers upon the one part, and the said Imperial German Government on the other part, and the said state of war continued until a treaty of peace which had been theretofore negotiated was ratiified by Congress, and, thereafter, on the 14th day of November, 1921, proclaimed by the President.

"3. That prior to, and at all the times hereinafter mentioned, the defendant was engaged in the building, engineering and construction trades and callings, and held itself out as being so engaged and as being skilled in the said trades and callings, and as possessing the degree of skill usual and customary among persons engaged therein.

"4. That on or about the 20th day of June, 1917, the defendant caused to be made, executed and entered into, on its behalf, an agreement in writing with the plaintiff, whereby the defendant undertook to superintend and supervise the construction of, and to construct for the plaintiff the said army cantonment known as Camp Funston, upon the terms and conditions set forth in said written agreement, a copy of which marked, Exhibit A, is annexed hereto and made a part hereof, the said army cantonment being hereinafter referred to for convenience, as the 'work.'

"5. That on or about the 28th day of June, 1917, the defendant entered upon the performance of said work, which said work was of a kind and nature commonly performed by those engaged in the building, engineering and construction trades and callings.

"6. The defendant, throughout the construction of said cantonment, failed to exercise due care and skill in the organization, planning, performance, superintendence and supervision of the work in the following respects:

"(a) The defendant failed to lay out the work, in that, having been furnished by the plaintiff prior to the commencement of the work with detailed plans of each type of building to be constructed, the number of buildings of each type to be constructed, the layout and grouping of the buildings, plans of the sewerage and water supply systems, engineering reports regarding the sub-surface and other conditions of the camp site, a detailed topographical map of the camp site and other data to enable the defendant to determine the type and size of organization and

the quantities and kinds of labor, material and equipment required in the execution of the work, the defendant failed to make such determination, but entered upon and continued the execution of the work without determining the type and size of organization and the quantities and kinds of labor, material and equipment required therein.

"(b) The defendant failed to organize and plan the work, in that, prior to beginning the work and thereafter, the defendant failed to provide and employ any operating schedule or plan for the purpose of insuring the orderly, systematic and expeditious execution of the work, and of providing for the continuous supply of and delivery to the work of the materials, labor and equipment required therein at the times and places and in the quantities and of the kinds necessary for the efficient execution of the work.

"(c) The defendant failed to give and enforce instructions and directions for the execution of the work to, and for the guidance of, its superintendents and foremen and others of its employees charged with the duty of superintending and supervising the same, in that (1) the defendant failed to define the respective authorities, duties and responsibilities of the several superintendents and foremen engaged in the work, and failed to co-ordinate the activities of each with those of the others or with the requirements of the work; and (2) when the defendant discovered, or in the exercise of reasonable care should have discovered, that in the course of the work materials and labor were being wasted in large quantities, the defendant failed to give orders or to take other steps to prevent such waste of materials and labor.

"(d) (1) The defendant failed to provide for any superintendence of the steam heating, plumbing and electrical work or of the installation of the sewerage disposal and water supply systems; (2) the defendant employed and continued to employ the following superintendents and foremen and others whose names are unknown to the plaintiff, with knowledge that the said superintendents and foremen were incompetent to perform the duties assigned to them respectively, by reason of the fact that they had never previously acted as superintendents and foremen in a construction project, namely, Earl Peck, W. J. Dublitz, Dewey Peck and L. A. Hilton; (3) the defendant employed and continued to employ superintendents and foremen whose names are unknown to the plaintiff, with knowledge that they were without experience in supervising or superintending the particular kind of work to which they were respectively assigned by the defendant; and (4) the defendant continued to employ the following superintendents and foremen and others whose names are unknown to the plaintiff, with knowledge that they and each of them was continuously failing to prevent or was permitting material to be wasted, and the workmen employed under them to loaf on their jobs and to perform their work in an inefficient manner, namely, E. S. Belden, Hiram Elliott, Henry Musick, Sam Wyatt, Charles Smith, M. V. Springer, Ed Schantier, E. A. Baker, Jack Hughes, Ben West, John Dick, Rudolph Bobby, A. Young, Charles Becker, Verne Roberts, Virgil Stewart, C. D. Lawless, C. C. Krieder, Charles Gellen, Harry Frost, Gust Fields, Bert Ettlebrook, J. C. Jackson, Frank Johnson, and James Hayes.

"(e) The defendant failed to provide, install and maintain a proper and adequate system for the employment, discharge, allocation, distribution, classification, compensation, supervision, superintendence, control, discipline and direction of labor, in that (1) the employment of labor was placed and continued in charge of clerks, whose names are unknown to the plaintiff, who were inexperienced in the employment of labor and who were given no instructions in that regard; (2) the defendant failed to provide and maintain any method for determining the respective qualifications, skill and experience of the workmen whom it employed, or for determining their fitness and qualifications for the work for which they were respectively employed or to which they were respectively assigned, or for assigning men only to tasks for which they were fitted, or for the classification of the workmen engaged in the work according to their respective trades, qualifications, experience and skill, or for insuring the discharge of inexperienced and incompetent men, or for the assignment of skilled workmen only to work requiring skill, or for the assignment of unskilled workmen only to work requiring no skill, or for the segregation of skilled from unskilled labor, or for the segregation of the various kinds of skilled labor, or for the determination and payment of the compensation of workmen on the basis of their respective trades, skill and experience, or for the replacement of incompetent and inefficient superintendents, foremen and workmen with efficient and experienced men of the same class, or for the transfer of surplus labor from parts of the work on which it was not needed to other parts on which it was needed, or for determining the number, kind and qualifications of men re-

quired to do a given task or for insuring the assignment to a given task of only the necessary number of men possessing the required skill and experience, or for insuring that all of the men employed in the work would at all times have work to do, or for insuring that the various workmen engaged in the work would diligently perform the work assigned to them.

"(f) The defendant failed to provide, install and maintain proper and adequate systems, methods and means, and to give proper instructions and directions for, and properly and adequately to control, superintend, and supervise the purchase, reception, distribution, allocation, use, storage, and salvage of, and payments for, materials, equipment and tools, in that (1) the purchase and procurement of materials and equipment were entrusted to one W. J. Bublitz who, as the defendant knew, was without previous experience in the purchase or procurement of building materials and equipment, and was in fact, incompetent, by reason of his inexperience, to undertake the purchasing and procurement of the materials and equipment required in a construction project of the magnitude of Camp Funston; (2) the defendant failed to provide and maintain any system or method for purchasing materials, equipment and tools, or for hiring equipment at prices which were reasonable under the then existing circumstances, and in the nearest available markets; (3) the defendant failed to provide for the unloading of materials and equipment in such a manner as to insure the segregation of the various kinds of materials and equipment delivered to the work but, on the contrary, materials and equipment of all kinds were permitted to be commingled and confused; (4) the defendant failed to provide for the storage and care of materials and equipment after they were delivered to the work either before or after their distribution to the various parts thereof, and especially of materials and equipments which required protection from the elements; (5) after materials and equipment were delivered to the work, the defendant failed to provide for their expeditious distribution throughout the work or to the parts of the work where such materials and equipment were needed; (6) the defendant failed to provide for determining the requirements of the various parts and branches of the work, as the work progressed, for materials and equipment, or for the requisition by and the prompt delivery to the various parts and branches of the work of materials and equipment of the kinds, in the quantities, and at the times such materials and equipments were needed; (7) the defendant failed to provide for the orderly unloading or for the care of materials and equipment delivered to the various parts of the work upon delivery thereto; (8) the defendant made no provision to insure that materials and equipment delivered to various parts of the work would be used in the manner and for the purposes for which they were intended; (9) the defendant made no provision for the maintenance of continuing inventories or other records of materials on hand and in transit, or for the disposition and care of surplus materials and equipment delivered to the various parts of the work, or for the transfer of said surplus materials and equipment to other parts of the work where they were needed, or for guarding against the waste and destruction of such surplus materials and equipment.

"(g) The defendant failed properly to superintend and supervise the work and to provide and maintain an adequate and experienced and competent organization for the direction, superintendence, performance and execution of the work in the respects hereinabove alleged.

"7. That the cost of the work to the plaintiff, as performed by the defendant, was Eight Million, Seven Hundred Sixty-Six Thousand, Nine Hundred Eighty-Five Dollars and Twelve Cents ($8,766,985.12); that such cost, by reason of the defendant's breach of its duty in the respects aforesaid, and without any fault on the part of the plaintiff, exceeded the reasonable cost of the work to the extent of Three Million Dollars ($3,000,000.00); and that the plaintiff was thereby damaged in the sum of Three Million Dollars ($3,000,000).

"Count II.

"1. The plaintiff repeats and realleges, as a part of this cause of action, each and every allegation contained in the paragraphs numbered 1 to 4, inclusive, of the first cause of action hereof.

"2. By the terms of said agreement, the defendant undertook and agreed with the plaintiff to use due skill and care in the superintendence, supervision and performance of the work, and to perform or cause the same to be performed at a reasonable cost to the plaintiff, and at all times to use its best efforts in and about the superintendence, supervision and performance of the work to protect and subserve the best interests of the plaintiff.

"3. That, notwithstanding its agreement as aforesaid, and in violation thereof, the de--

fendant, throughout the construction of said cantonment, failed to use due care and skill in the superintendence, supervision, and performance of the work, and to use its best efforts in and about the superintendence, supervision and performance thereof to protect and subserve the best interests of the plaintiff, in the respects set forth in subdivisions (a) to (g) inclusive of the paragraph numbered 6 of the first cause of action hereof, each and every allegation of the said subdivisions of the said paragraph being here repeated and realleged as a part of this cause of action; and the defendant failed to perform the work or to cause the same to be performed at a reasonable cost to the plaintiff, but, on the contrary, the cost of the work exceeded the reasonable cost thereof, by the sum of Three Million Dollars ($3,000,000).

"4. That the plaintiff duly performed all of the conditions of the said agreement on its part to be performed.

"5. That by reason of the breach of the said agreement by the defendant in the respects aforesaid, the plaintiff was damaged in the sum of Three Million Dollars ($3,-000,000).

"Count III.

"1. The plaintiff repeats and realleges, as a part of this cause of action each and every allegation contained in the paragraphs numbered 1 to 4, inclusive, of the first cause of action hereof, and in the paragraph numbered 2 of the second cause of action hereof.

"2. That the defendant entered upon the performance of the said work, and from time to time during the course thereof rendered to the plaintiff bills, invoices, vouchers, and statements of the cost thereof, aggregating Eight Million, Seven Hundred Sixty-Six Thousand, Nine Hundred Eighty-Five Dollars and Twelve Cents ($8,766,985.12), and demanded payment thereof; that by presenting the said statements, bills, invoices, and vouchers to the plaintiff for payment the defendant thereby represented to the plaintiff that the reasonable cost of the work performed by the defendant, including the defendant's fee, was Eight Million, Seven Hundred Sixty-Six Thousand, Nine Hundred Eighty-Five Dollars and Twelve Cents ($8,766,985.12).

"3. That the plaintiff relied upon said representations and believed them to be true and, relying thereon and believing therein, the plaintiff paid to the defendant the several amounts set forth in each and all of the said several statements, bills, invoices and vouchers, and in the aggregate the plaintiff so paid to the defendant the sum of Eight Million, Seven Hundred Sixty-Six Thousand, Nine Hundred Eighty-Five Dollars and Twelve Cents ($8,766,985.12); that said representations were in fact false in that the said sum of Eight Million, Seven Hundred Sixty-Six Thousand, Nine Hundred Eighty-Five Dollars and Twelve Cents ($8,766,985.12) was in excess of the reasonable cost of the work performed by the defendant, to the extent of Three Million Dollars ($3,000,000); and that at the times that such representations were made they were known by the defendant to be false, or were recklessly made by the defendant without regard to the truth thereof.

"4. That by reason of the premises, the plaintiff was damaged in the sum of Three Million Dollars ($3,000,000).

"Count IV.

"1. The plaintiff repeats and realleges as a part of this cause of action, each and every allegation contained in the paragraphs numbered 1 to 4, inclusive, of the first cause of action hereof, in the paragraph numbered 2 of the second cause of action hereof, and in the paragraphs numbered 2 and 3 of the third cause of action hereof.

"2. That the said payments so made by the plaintiff to the defendant were made by the plaintiff in the mistaken belief that the reasonable cost of the work performed by the defendant was Eight Million, Seven Hundred Sixty-Six Thousand, Nine Hundred Eighty-Five Dollars and Twelve Cents ($8,766,985.12), and that the plaintiff was, therefore, indebted to the defendant under the said agreement in that amount; whereas, in truth and in fact, the said sum of Eight Million, Seven Hundred Sixty-Six Thousand, Nine Hundred Eighty-Five Dollars and Twelve Cents ($8,766,985.12) exceeded the reasonable cost of the work performed by the defendant, and the plaintiff overpaid the defendant, to the extent of Three Million Dollars ($3,000,000); that by reason of such overpayment the defendant has been unjustly enriched at the cost and expense of the plaintiff, and has had and received from the plaintiff, in the manner and during the period aforesaid, the sum of Three Million Dollars ($3,000,000) which in equity and good conscience, the defendant should repay to the plaintiff.

"3. That in and by its original petition filed in this action, the plaintiff made demand upon the defendant for the repayment to the plaintiff of said sum of Three Million Dollars ($3,000,000), but the defendant has failed and refused, and still fails and refus-

es, to repay the said sum to the plaintiff, to the plaintiff's loss and damage in the sum of Three Million Dollars ($3,000,000).

"Wherefore, the plaintiff prays judgment against the defendant in the sum of Three Million Dollars ($3,000,000), together with the costs of this action."

The demurrer was general and challenged the petition on the ground that it failed "to state facts sufficient to constitute a cause of action."

Jerome Michael, Sp. Asst. Atty. Gen. (Al. F. Williams, U. S. Atty., of Topeka, Kan., Paul Shipman Andrews, Henry Gale, and William T. Chantland, Sp. Asst. Attys. Gen., on the brief), for the United States.

Robert N. Golding, of Chicago, Ill. (Weymouth Kirkland, of Chicago, Ill., and John S. Dean, of Topeka, Kan., on the brief), for defendant in error.

O. M. Brockett, of Des Moines, Iowa, amicus curiæ.

Before SANBORN and LEWIS, Circuit Judges, and PHILLIPS, District Judge.

LEWIS, Circuit Judge (after stating the facts as above). [1] This action is founded on the contract between the parties of date June 20, 1917 (set out above), for the Construction of Camp Funston on the Fort Riley Military Reservation; and the errors assigned are directed to the ruling of the court in sustaining a general demurrer to the third amended petition and its judgment of dismissal of the cause on that ruling. The original and first amended petitions each set up one alleged cause of action for damages based on a claimed breach of the contract by George A. Fuller Co. because of alleged lack of skill and negligence in its execution; and the second and third amended petitions each contain four alleged causes of action. To each petition a copy of the contract was attached and made a part of the pleading by reference. The preceding petitions were each held bad on motions to strike, to make more certain and demurrers filed thereto by the defendant. Before we come to the issue presented by the demurrer the rights and duties of the parties and the basis on which they rest should be determined, for the purpose of pleading. In reference to the third amended petition plaintiff's counsel in his argument here says: "One of those causes of action is negligence, one in breach of contract, one in quasi-contract, and one in fraud and deceit." We fail to see any distinction between counts 1 and 2. Each of them charges the same negligence in general terms

as constituting breach of the contract. The third count may be an attempt to charge damages for fraud and deceit; and the fourth is clearly for money had and received. But it is not necessary to define them. The rights of each party rest on the contract and the acts complained of were done in its performance. Technical definitions are of no avail. The facts stated in the petition determine its character and sufficiency. Code pleading deals with substance, not with formalities. In Hamilton v. Empire Gas & Fuel Co., 297 F. 422, this court had occasion to consider the effect of stating a cause of action as for a tort when the plaintiff's rights and duties rested on contract. We accepted the rule announced by Underhill and Pollock on Torts when applied to Code pleading and quoted from the latter thus:

"Now that forms of pleading are generally abolished or greatly simplied, it seems better to say that wherever there is a contract to do something the obligation of the contract is the only obligation between the parties with regard to the performance, whether there was a duty antecedent to the contract or not. But injury which would have been a tort as breach of a duty existing at common law if there had not been any contract is still a tort;"
—and from Whittaker v. Collins, 34 Minn. 299, 25 N. W. 632, 57 Am. Rep. 55:

"Where the action is not maintainable without pleading and proving the contract— where the gist of the action is the breach of the contract, either by malfeasance or nonfeasance—it is, in substance, whatever may be the form of the pleading, an action on the contract. * * * The foundation of the action is the contract, and the gravamen of it its breach."

Pomeroy's Code Remedies (3d Ed.) § 576, says:

"Since the reformed pleading requires the facts to be averred as they actually took place, it does not in general permit a single cause of action to be set forth in two or more different forms or counts, as was the familiar practice at the common law. The rule is undoubtedly settled, that, under all ordinary circumstances, the plaintiff who has but one cause of action will not be suffered to spread it upon the record in differing shapes and modes as though he possessed two or more distinct demands; and when he does so without special and sufficient reason, he will be compelled, either by a motion before the trial or by an application and direction at the trial, to select one of these counts, and to abandon the others."

[2] And so here, the third amended petition, as well as the three that preceded it, each made the contract a part thereof by reference, and declared a breach thereof by the defendant. The contract provided that the material and supplies when brought to the site of the work should become the property of plaintiff, and we do not doubt that a good cause of action ex delicto might have been stated for its wanton waste or destruction by defendant. Such acts would have been separate and apart from the execution of the contract. But no case of that kind was attempted to be made. All allegations about destruction or waste of material were made not as independent causes of action but as instances of neglect of contractual duty to sustain the alleged breach and entitle plaintiff to general damages. We think it clear that plaintiff must rely on the contract and base its action thereon in seeking relief. The contract was made a part of the pleading and the allegations of the petition must be considered in connection with it.

The Contractor was to receive his net outlay in doing the work and a fee based on that outlay, as shown in Article III of the contract. Article IV provides for monthly settlements between the Contracting Officer and the Contractor to ascertain the cost for materials and labor during the preceding month, and a part of the fee based thereon, which were to be thereupon paid to the Contractor; and it says in reference to those settlements:

"The statement so made and all payments made thereon shall be final and binding upon both parties hereto."

Because of the possible magnitude of the undertaking it was contemplated (Art. II) that the Contractor might need engineers, superintendents, time-keepers, foremen and other employés in connection with the work; but Article I expressly provided that in the construction and completion of the cantonment the work should be done "in accordance with the drawings and specifications to be furnished by the Contracting Officer, and subject in every detail to his supervision, direction and instruction." The Contracting Officer was given the right to make changes in the drawings and specifications so to be furnished, to require additional work, to direct the omission of work previously ordered, notifying the Contractor from time to time in regard thereto. It is obvious that the power and control of the Contracting Officer over the extent of the work to be done and his supervision and control during its progress were complete. The schedule fixing the

fees shows that the work which the Contractor would be called on to do might be less than $100,000 and it might greatly exceed $3,500,000. All material, equipment, machinery and supplies delivered at the site of the work, upon inspection and acceptance in writing by the Contracting Officer, became the property of the United States. The contract itself says it is a departure from the usual procedure in the matter of letting contracts and that the method which it adopted was for the purpose of insuring the most expeditious results; it also recognized the existence of disturbed conditions in the contracting industry throughout the country. It is plain that the Contractor did not have a free hand. It was required to be constantly ready to receive directions and instructions about the work from the Contracting Officer. These stipulations, agreements and recitals in the contract are to be borne in mind when we come to consider the sufficiency of the third amended petition.

[3-6] A general demurrer is well taken when the petition shows that no legal wrong has been done, or when the petition omits some averment, necessary either to establish the wrong or to so connect the parties with it as to entitle the plaintiff to redress. Bliss on Code Pleading (2d Ed.) § 413. With the facts that have been stated and the principles of law to which we have adverted in mind, we come to an estimate of the third amended petition; and we think the petition shows on its face (1) that no legal wrong has been done, and (2) that it omits averments necessary to the establishment of a wrong to plaintiff. It avers that the contract was entered into on June 20, 1917, by which it was agreed that the defendant would construct the army cantonment known as Camp Funston, "the said army cantonment being hereinafter referred to for convenience as the 'work,'" that defendant entered upon the performance of the work about June 28, 1917, and throughout the construction of said cantonment failed to exercise due care and skill in the respects stated; that the cost of the work (the cantonment) to plaintiff as performed by defendant was $8,766,985.12, that such cost by reason of defendant's breach of its duty in the respects aforesaid exceeded the reasonable cost of the work to the extent of $3,000,000 and plaintiff was damaged in that sum. The respects in which the defendant failed to exercise due care and skill and was thus negligent, constituting a claimed breach of the contract, are stated in paragraph 6, subds. (a) to (g) inclusive. As to these charges we agree with the learned

district judge, they are mere statements of glittering generalities and conclusions of the pleader. The pleader seems to have had in mind systems, methods and plans for the employment and discharge of workmen for direction of the work as it progressed, for procurement, receipt and distribution of material and supplies; but he did not inform the defendant what those systems, methods and plans are, whether they are established systems, methods and plans well known to and generally followed by contractors who do the kind of work provided for in this contract and under the conditions and requirements named in it. Obviously, he could not do this. The contract says it is a departure from the usual way of doing such things. The Contractor was put in the attitude of waiting on daily instructions from the Contracting Officer as to changes, extent of work to be done and the forces needed for doing it. Nor does it appear that the failure to have and maintain the systems, methods and plans which the pleader had in miind caused, or to what extent they caused, the wrongs and injury complained of; e. g., admitting the absence of systems, methods and plans alleged in subdivision (f), non constat their omission caused the things seemingly attributed to them, for take (8) under subdivision (f), from a failure to make provision to insure that materials and equipment delivered to various parts of the work would be used in the manner and for the purposes for which they were intended, it does not follow that materials and equipment were not delivered promptly and used at the places and for the purposes for which they were purchased and intended; and so throughout paragraph 6 of count I, by reference made a part of count II, many other allegations of the same import are found. An allegation that one failed to make provision to insure against the happening of an event is not an averment that the thing to be insured against happened, nor how many times it happened, nor that it happened because no provision had been made to insure that it would not happen. Subdivisions (b) and (c) are of the same type. The burden of complaint in paragraph 6 is the failure of defendant to exercise due care and skill in organizing, planning and superintending the work. No standard of organization with which defendant was bound to comply, nor the extent to which it was to exercise superintendence, is stated; nor does it appear how it was that these alleged failures operated to the injury of plaintiff. On the whole the paragraph seems to be based on a theoretical standard in the mind of the pleader. The defendant is certainly not advised as to just what it should have done in those respects. It is not a statement of facts tending to show a breach of contract but conclusions. The contract did not require defendant to do things of which plaintiff now complains. It would have been idle and futile, without the acquiescence and co-operation of the Contracting Officer, for the Contractor to have formulated systems, methods and plans to be carried out by him in executing the work; for Article I of the contract gave to the Contracting Officer superior power and authority in every detail over the direction and supervision of the work as it progressed. The Contractor might to-day put twenty men at work here. To-morrow the Contracting Officer could say they must go yonder. The Contractor might make ready to deliver material for a certain building or buildings, but the Contracting Officer could direct that it be taken elsewhere. Paragraph 6 flies in the face of the contract in assuming that the Contractor could formulate and carry out its own plans and methods in doing the work. Facts constituting alleged negligence or fraud claimed as breaches of contract must be stated, thus giving the defendant opportunity to meet them in answer and proof. And it must reasonably appear that the facts thus relied on were in violation of the contract and wrought an injury to plaintiff; if not so stated the petition should be held bad on demurrer. We think this petition insufficient in those respects.

[7, 8] The petition fairly interpreted shows that the contract was performed by the parties. That is, the defendant constructed the cantonment and received pay therefor. It is argued that there is no express allegation that the payments made, amounting in the aggregate to $8,766,985.12, were ascertained in the manner provided by the contract. There is no allegation that the contract was ever changed, modified or annulled, or that the sums paid were paid because of any obligation of the plaintiff to the defendant other than on the contract. Paragraph 4 of Count II alleges "that the plaintiff duly performed all of the conditions of the said agreement on its part to be performed." An ascertainment by the Contracting Officer of the monthly payments to be made to the Contractor as provided in Article IV was a condition precedent to the payments, and but for statutory provision the pleader would have been required to set up the facts in that respect. The plea as made, in accordance with the statute, embodies by necessary im-

plication those facts. Thus the petition shows that defendant constructed the cantonment and was paid therefor from time to time, as the contract provides, the gross named sum. Even without this paragraph 4 it could not be doubted that the payments were made on monthly statements as the contract provides. For there is no allegation that they were not so made, and to presume that they were, without a showing of some other liability therefor, would rest on an assumption of criminal conduct on the part of Government officials. In that view of the effect of the pleading, which we take, plaintiff was under the necessity of charging the Contracting Officer, or his representative with unfaithfulness; and having failed to make any charge of that kind whatsoever the petition omitted an averment necessary to the establishment of a legal wrong. The rule on that subject cannot be doubted. When parties to a contract agree on an umpire or arbitrator and give him power and authority to make settlement of the amount due from one to the other in performance, and expressly provide in the contract that his determination shall be final and binding upon both parties, neither of them can maintain an action against the other for acts or transactions based on and growing out of the contractual relation without avoiding the settlement so made for fraudulent conduct on the part of the arbitrator, or for gross mistake implying bad faith on his part or for his failure to exercise his honest judgment. Kihlberg v. United States, 97 U. S. 398, 24 L. Ed. 1106; United States v. Shrewsbury, 90 U. S. (23 Wall.) 508, 23 L. Ed. 78; Chicago, S. F. & C. Railroad Co. v. Price, 138 U. S. 185, 11 S. Ct. 290, 34 L. Ed. 917; Ripley v. United States, 223 U. S. 695, 750, 32 S. Ct. 352, 56 L. Ed. 614; Martinsburg & P. Railroad Co. v. March, 114 U. S. 549, 5 S. Ct. 1035, 29 L. Ed. 255; United States v. Mason & Hanger Co., 260 U. S. 323, 43 S. Ct. 128, 67 L. Ed. 286; Cook v. Foley, 152 F. 41, 81 C. C. A. 237; United States v. Hurley, 182 F. 776, 105 C. C. A. 208; Missouri, K. & T. Railroad Co. v. Elliott (C. C.) 56 F. 772.

These were the principles applied by the learned district judge in ruling on the demurrer; and his action did not surprise counsel, because he considered the same principles in memorandum opinions in ruling on the prior petitions, each of which disclosed the same defects in pleading.

[9] Finally, it is said the judgment of dismissal should be reversed because it ordered the costs taxed against plaintiff. But if, as claimed, the court was without power to tax plaintiff with the costs, its order in that respect is void. 27 Stat. 252, U. S. Comp. Stat. § 1630. There can be no prejudice on that ground.

Affirmed.